Allan M. McGarvey
Dustin Leftridge
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, MT  59901
(406) 752-5566
AMcGarvey@mcgarveylaw.com
DLeftridge@mcgarveylaw.com

Robert K. Baldwin
Baldwin Law, PLLC
P.O. Box 10850
Bozeman, MT  59719
(406) 551-9993
rbaldwin@baldwinlawfirm.com
adavis@baldwinlawfirm.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| KENNETH B. COLEMAN, et al[1]<br><br>          Plaintiffs,<br><br>     v.<br><br>NATIONAL INDEMNITY COMPANY,<br><br>          Defendant. | **Cause No. 4:19-cv-00039-BMM-JTJ**<br><br><br>**AMENDED**<br>**CLASS ACTION COMPLAINT**<br><br>and<br><br>**JURY DEMAND** |

---

[1] The complete list of named plaintiffs/decedents are those persons listed on Exhibit "A" attached hereto.

## Jurisdiction

1.      This is a class action on behalf of the named plaintiffs, individually and as class representatives of all similarly situated claimants meeting the class definitions set forth below. The named plaintiffs (including those succeeding to the rights and acting on behalf of the estates or heirs of claimants who are deceased) are those persons listed on Exhibit "A" attached hereto.

2.      Plaintiff Kenneth Coleman is a Montana resident who resides in Cutbank, Glacier County, Montana.

3.       Most named plaintiffs are citizens residing in Montana; none of the named plaintiffs and none of the members of the class proposed herein are citizens of or reside in Nebraska; each plaintiff and each class member is a citizen of a state other than the State of Nebraska. Each named plaintiff pursued a claim for personal injury damages against the State of Montana (sometimes referred to hereafter as "the State") for injuries incurred in Montana.

4.      Defendant National Indemnity Company is a Nebraska corporation with its principal place of business in Nebraska. It is a citizen of the State of Nebraska. It contracted to provide insurance to the State of Montana under Insurance Policy No. PE250001.

5.      This Court has jurisdiction of this case pursuant to 28 U.S.C. §1332 because there is both minimal and complete diversity of citizenship, and because

the amount in controversy on the claim of each plaintiff and each class member in this action exceeds the sum or value of $75,000, exclusive of interest and costs and because the amount in controversy on the class claims exceeds $5 million.

### The Nature of this Action

6.    Plaintiffs complain of the manner in which National Indemnity Company dealt with their and the class members' claims for compensation against National Indemnity Company's insured, the State of Montana.

7.    By this action, plaintiffs seek on behalf of themselves and the class members:

(a)    An award of compensatory and punitive damages for breach of various statutory and common-law duties owing to them; and

(b)    Disgorgement of profits that National Indemnity Company realized on the float on the monies that should have been paid to the plaintiffs and class members by treating its liability to the plaintiffs and class members as a source of investment funds, the repayment of which should be delayed as long as possible.

Plaintiffs include this paragraph as a broad and general characterization of the relief they seek, and not as a limitation on any particular relief which they may specifically request or to which they may be entitled. *See* Rule 54(c), Fed.R.Civ.P.

## The Underlying Claims

8.      This is a class action on behalf of the named plaintiffs as well as all similarly situated claimants meeting the class definitions set forth below.

9.      Each plaintiff and class member presented a claim that the State of Montana was liable for that claimant's asbestos-related disease injuries. (Herein, each such claim by each plaintiff and each class member is referred to as a "Claim.").

10.     Each Claim asserted that the State of Montana owed a duty to warn plaintiffs of their asbestos exposures including by providing to workers the State's reports of inspections of W.R. Grace's Libby facilities.

11.     The State of Montana's liability for each plaintiff's and class member's Claim had become reasonably clear by no later than June 26, 2003, when the Supreme Court of the State of Montana decided in *Orr v. State*, 2004 MT 354, ¶¶ 40, 47, 80, 324 Mont. 391, 106 P.3d 100, that the State of Montana owed, to workers and the family members injured by the workers' "take home" asbestos, "statutory duties to the public and to persons confronted with workplace health hazards," including the duty "to protect the safety and health of the Miners by warning them of known dangers associated with their workplace," that the State of Montana "is not shielded [from liability] by the application of the Public Duty Doctrine," and that "the existence of sovereign immunity prior to July 1, 1973,

does not insulate the State from the Miners' causes of action."

12.    There was no evidence whatsoever that the State ever gave a warning in fulfilment of the clear legal duty. Indeed, each time an inspection was performed and/or a report of exposures was generated, the State of Montana repeated its breaching actions by withholding a warning. Because all plaintiffs and class members (a) have asbestos- specific disease, and (b) had indisputably substantial exposures to the asbestos of which the State failed to warn, all elements of liability were reasonably clear at all times relevant to this action.

13.    National Indemnity Company has admitted and affirmatively urged in its court filings in the Coverage Action (defined below) that the liability of the State of Montana was demonstrated by "undisputed" facts, and that, even prior to issuance of the Insurance Policy No. PE250001 in 1973, "the State knew about the toxic asbestos conditions at the Libby Mine and knew that workers were subject to risk and injury and death as a result of their exposure to those conditions."

## National Indemnity Company's Business Model
## and
## Plan to Delay Payment of Insurance Claims

14.    As used in this Amended Complaint, the following words and phrases have these meanings:

(a)    "Long-Tail Risks" or "Long-Tail Liabilities" are those which an insurance company may owe under occurrence-based policies but

which, by their nature, have a long latency period such that the existence or value of the claim(s) may not become known, and may not be resolved, for many years, or even decades, after the policy period.

(b)    "Ceding Insurer" refers to an insurance company any of whose liabilities and loss reserves attendant to past occurrences are acquired by an investment entity.

(c)    "Retroactive Reinsurance Market" refers to the market through which one may acquire, through acquisition transactions including Loss Portfolio Transfers and insurance company corporate reorganization and/or entity acquisition, some or all of an insurance company's liabilities and loss reserves for losses attendant to past occurrences insured by the insurance company.

(d)    "Loss Portfolio Transfer" means a transaction by which an Investment Entity (a) acquires some or all of a Ceding Insurer's liabilities and loss reserves for losses attendant to past occurrences insured by the insurance company, and (b) receives a payment or premium for such liability acquisition.

(e)    "Float" refers to money received by an insurer for acquiring risk and which may or will be needed to pay covered losses, but which

the insurer can invest to gain investment income between the receipt of such payment or premium and the date losses are paid. Float may exist either with respect to premiums collected upon issuance or renewal of a policy or premiums or payments received from a Ceding Insurer in the context of a Loss Portfolio Transfer.

(f)    "Clear Liability Claim" means a claim (a) to which settlement and/or advance payment duties have attached by reason of clear liability, and (b) which includes past medical expenses.

(g)    "Investment Profit" means profit that an insurer or retroactive reinsurer makes by investing the Float during the time prior to paying losses.

15.    National Indemnity Company is "part of the Berkshire Hathaway group of insurance companies," having been purchased by Berkshire Hathaway, Inc., in 1967. *See* https://www.nationalindemnity.com/about-us.html. According to Warren Buffet, Berkshire Hathaway's Chairman of the Board, "had we not made this acquisition [National Indemnity Company], Berkshire would be lucky to be worth half of what it is today." *Id*.

16.    According to National Indemnity Company's website, as of the end of 2022 Q3, it had Total Admitted Assets in excess of $335 billion, and Policyholders' Surplus in excess of $295 billion. *Id*., at "Our Financial Reports •

National Indemnity Company".

17.     National Indemnity Company is an active participant in the

Retroactive Reinsurance Market, acquiring and administering Long-Tail Risks,

including by acquiring liabilities of Ceding Insurers through Loss Portfolio

Transfers. For instance, its statutory annual statement for the year ended December

31, 2021, reflected that it had "assumed retroactive reinsurance contracts that

transfer liabilities for losses that have already occurred" for which it had received

over $33 billion in payments. *Id*., note 23(F).

18.     A key part of National Indemnity Company's business is its

investment of the Float to generate Investment Profit during the period between

receipt of premiums or payment, whether for policy issuance or renewal or for

acquiring the long-tail liabilities of other insurers via Loss Portfolio Transfers. In

fact, Buffet has explained that the very reason that Berkshire Hathaway entered the

insurance business was to acquire Float which it could use to generate Investment

Profit:

> Before I discuss our 2017 insurance results, let me remind
> you of how and why we entered the field. We began by
> purchasing National Indemnity and a smaller sister
> company for $8.6 million in early 1967. With our purchase
> we received $6.7 million of tangible net worth that, by the
> nature of the insurance business, we were able to deploy
> in marketable securities. It was easy to rearrange the
> portfolio into securities we would otherwise have owned
> at Berkshire itself. In effect, we were "trading dollars" for
> the net worth portion of the cost.

> The $1.9 million premium over net worth that Berkshire paid brought us an insurance business that usually delivered an underwriting profit. Even more important, the insurance operation carried with it $19.4 million of "float" – money that belonged to others but was held by our two insurers.
>
> Ever since, float has been of great importance to Berkshire. When we invest these funds, all dividends, interest and gains from their deployment belong to Berkshire. (If we experience investment losses, those, of course, are on our tab as well.)

Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 24, 2018).

19.    Buffet further explained that Float "materializes at p/c insurers in several ways," including that losses "such as the harm caused by exposure to asbestos … may take many years to surface and even longer to evaluate and settle…." Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 24, 2018). Continuing this theme, Buffet expounded that certain lines of business "labelled 'long-tail' in industry jargon … generate far more float than" policies "which require insurers to almost immediately make payments to claimants…." Buffet letter to the sof Berkshire Hathaway, Inc. (February 24, 2018).

20.    Buffet has also explained National Indemnity Company's heavy involvement in Retroactive Reinsurance by which it assumes Long-Tail Liabilities and that, "as a result," Berkshire Hathaway has experienced "extraordinary" growth in Float:

> Berkshire has been a leader in long-tail business for many

> years. In particular, we have specialized in jumbo *reinsurance* policies that leave us assuming long-tail losses already incurred by other p/c insurers. As a result of our emphasizing that sort of business, Berkshire's growth in float has been extraordinary. We are now the country's second largest p/c company measured by premium volume and its leader, by far, in float.

Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 24, 2018).

21.    Buffet has also explained the advantage of Float over other sources of investment funds:

> Float will probably increase slowly for at least a few years. When we eventually experience a decline, it will be modest – at most 3% or so in any single year. Unlike bank deposits or life insurance policies containing surrender options, p/c float can't be withdrawn. This means that p/c companies can't experience massive "runs" in times of widespread financial stress, a characteristic of prime importance to Berkshire that we factor into our investment decisions.
>
> Charlie and I never will operate Berkshire in a manner that depends on the kindness of strangers – or even that of friends who may be facing liquidity problems of their own. During the 2008-2009 crisis, we liked having Treasury Bills – loads of Treasury Bills – that protected us from having to rely on funding sources such as bank lines or commercial paper. We have intentionally constructed Berkshire in a manner that will allow it to comfortably withstand economic discontinuities, including such extremes as extended market closures.

Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 24, 2018).

22.    Buffet repeated many of these themes in his February 23, 2019, letter to the shareholders of Berkshire Hathaway, Inc., under the heading "Insurance,

'Float,' and the Funding of Berkshire":

> One reason we were attracted to the P/C business was the industry's business model: P/C insurers receive premiums upfront and pay claims later. In extreme cases, such as claims arising from exposure to asbestos, or severe workplace accidents, payments can stretch over many decades.

> This collect-now, pay-later model leaves P/C companies holding large sums – money we call "float" – that will eventually go to others. Meanwhile, insurers get to invest this float for their own benefit. Though individual policies and claims come and go, the amount of float an insurer holds usually remains fairly stable in relation to premium volume.

*Id*.

23.    Buffet also explained, again, the advantage of using Float as a source of investment capital, i.e., because it is not subject to a demand for immediate repayment:

> We may in time experience a decline in float. If so, the decline will be *very* gradual – at the outside no more than 3% in any year. The nature of our insurance contracts is such that we can *never* be subject to immediate or near-term demands for sums that are of significance to our cash resources. That structure is by design and is a key component in the unequaled financial strength of our insurance companies. That strength will *never* be compromised.

Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 23, 2019).

24.    He also explained that the profits an insurer may earn can come from underwriting profits (when premiums exceed expenses and losses paid) or from

Investment Profit (which he described as "the investment income the float produces"). Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 23, 2019). "When such a profit is earned, we enjoy the use of free money – and, better yet, get paid for holding it." *Id*. Thus, the Float is, in National Indemnity Company's business model, the "free use of money."

25.    Buffet has also made clear that, to National Indemnity Company and Berkshire Hathaway, Inc., the Float was not merely an incident to operating an insurance company, but was, instead, an extremely advantageous source of investment capital because it allows Berkshire Hathaway, through National Indemnity Company, to generate Investment Profit by "holding and using other people's money." Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 23, 2019).

> Beyond using debt and equity, Berkshire has benefitted in a major way from two less-common sources of corporate funding. The larger is the float I have described. So far, those funds, though they are recorded as a huge net liability on our balance sheet, have been of more utility to us than an equivalent amount of equity. That's because they have usually been accompanied by underwriting earnings. In effect, we have been paid in most years for holding and using other people's money.

Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 23, 2019).

26.    Buffet made similar statements the next year. *See* Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 22, 2020). And he explained

the extreme importance of Float—"other people's money":

> Our property/casualty ("P/C") insurance business has been
> the engine propelling Berkshire's growth since 1967, the
> year we acquired National Indemnity ….

Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 22, 2020).

27.     Buffet also recognized that "[i]insurance is a business of promises…."
Buffet letter to the shareholders of Berkshire Hathaway, Inc. (February 22, 2020).

28.     In this case, the plaintiffs and class members—mostly sick and dying
working men and women or their family members who were sickened from
exposure to "take home" asbestos—were the "other people" whose money
National Indemnity Company used as Float to generate Investment Profit.

29.     In this case, the "promise" which was supposed to be the essence of
National Indemnity Company's business was the promise that it would pay
damages suffered by individuals, like the plaintiffs and class members, who were
injured by the actions of the State of Montana.

30.     National Indemnity Company's business model, however, depended
upon delay in the payment of those losses, even on Clear Liability Claims, so that
it could provide the Float to generate Investment Profit for Berkshire Hathaway,
Inc., thus "propelling Berkshire's growth since 1967."

31.     Under National Indemnity Company's business model, by which
utilization of the Float is not merely an incident to engaging in the business of

insurance but is, instead, a critical means by which a huge conglomerate (Berkshire Hathaway) acquires and maintains investment capital on advantageous terms, delay in resolution of Claims, including delay in settling Clear Liability Claims and delay in resolving any coverage issues (whether bona-fide or otherwise) becomes highly important. The incentive to treat insureds or third-party claimants fairly or in accordance with duties owed becomes subordinated to the financial incentive to delay, allowing continued Investment Profit on the Float, at the expense of the claimants, the "other people" whose money comprises the Float.

32.    Under National Indemnity Company's business model, if it can delay the payment of losses long enough, including by delay in funding a settlement of even Clear Liability Claims or delay in resolving any coverage disputes (regardless of whether such disputes are legitimate or not), it will still make a profit even if it ultimately loses the coverage battle and must pay the loss. Thus, if it delays enough, National Indemnity Company wins even when it loses.

33.    While such delay can be extremely profitable for National Indemnity Company, it has and, in this case had, devastating consequences for injured, ill, and vulnerable Montanans. As National Indemnity Company delayed, enjoying continued Investment Profit on the Float, class members suffered and died without realizing justice or receiving payment of ongoing medical expenses or adequate compensation by which they might have alleviated their suffering.

**National Indemnity Company's Delay**
**and**
**Failure to Accept Responsibility for the Claims**

34.    National Indemnity Company insured the State of Montana for its liability for all losses from each plaintiff's and each class member's Claim. Among other things, Insurance Policy No. PE250001, promised that National Indemnity Corporation would pay "all sums" for bodily injury "caused by an occurrence" which the State "shall become legally obligated to pay as damages."

35.    Persons (not members of the class defined below) first began to make claims against the State of Montana in 2000 based upon the same duties and breaches as the Claims that the class members later asserted. National Indemnity Company was informed of the existence and pendency of those prior claims no later than July 2002 when it received notice from the State of Montana.

36.    At that point, National Indemnity Company owed to the State of Montana and to the claimants, various statutory and common-law duties. For instance, but without limitation, National Indemnity Company owed to the State of Montana a duty to defend it from the claims asserted by the claimants. National Indemnity Company breached that duty to defend the State of Montana by, among other things, contesting coverage under Insurance Policy No. PE250001 for nearly a decade before initiating a declaratory judgment action to seek a judicial resolution of the coverage claims. *See Nat'l Indem. Co. v. State*, 2021 MT 300, ¶

47, 406 Mont. 288, 499 P.3d 516 (the "Coverage Action").

37.    National Indemnity Company also owed duties to third-party claimants, like the plaintiffs and members of the class defined below. Among those duties, but without limitation, were the following:

(a)    Common-law duties to act fairly and in good faith, including to act reasonably and promptly, and not to delay or deny claim resolution for the improper purpose of opportunistic misuse of insured liability reserves for investment for profit;

(b)    Statutory duties, including duties not to:

i.    refused to pay Claims without conducting a reasonable investigation based upon all available information;

ii.    fail to affirm coverage of the Claims within a reasonable time after proof of loss statements have been completed;

iii.    neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of the Claims in which liability had become reasonably clear; and

iv.    fail to promptly settle the Claims, on which liability had become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.

38.     The foregoing duties subsumed within them a duty to pay to the class members those damages which were not reasonably in dispute, including medical expenses and lost wages, without demanding or waiting for a settlement or release from the class members.

39.     Prior to 2022, National Indemnity Company did not:

(a)     Make or attempt to make a sufficient investigation of any Claim to reasonably evaluate the amount or nature of the claimed damages;

(b)     Acknowledge or accept coverage for any Claim;

(c)     Make any settlement offers, settlement contribution offers, or payments toward the satisfaction of any Claim;

(d)     Offer or attempt to negotiate a settlement while preserving any legitimate coverage defense;

(e)     Attempt in any way to negotiate the settlement of any Claim; or

(f)     Make any advance payment of any medical expense or wage loss amount within any Claim.

40.     These actions and failures of National Indemnity Company occurred while the plaintiffs and class members—similarly situated individuals with Claims against the State of Montana for Libby Asbestos injuries—suffered and continued to suffer uncompensated losses for such injuries and the resulting economic burdens and health care needs resulting from such injuries.

41.     The nature of the injuries which the plaintiffs and class members suffered as a result of their exposure to asbestos were such that the ongoing delay in resolution of the Claims inflicted continuing harm upon the plaintiffs and class members even beyond the harm that would normally be expected from delay in payment of damages to an injured third-party claimant, such as interest for the loss of use of money. Among other things, their injuries manifested many years or decades after the exposure, meaning that it was foreseeable that the claimants would be older. Additionally, the injuries were ongoing and often incurable, leading inexorably to ongoing physical suffering and the need for ongoing medical treatment or other expenses to alleviate their suffering, for instance, for home or portable oxygen. Given these characteristics of the injuries suffered by the plaintiffs and class members, ongoing delay was particularly pernicious and cruel in light of the ongoing human suffering and economic duress.

42.     Because of the nature of their injuries, the plaintiffs and class members were particularly at risk to be devastated by the ongoing medical expenses, the harm to their credit rating from their inability to pay ongoing expenses, and their inability to get treatment, including, but not limited to, their inability to even afford home and/or portable oxygen so that they could even breathe or venture outside of the confines of their home.

43.     National Indemnity Company knew of the particular vulnerabilities of

the plaintiffs and class members. National Indemnity Company knew that those vulnerabilities rendered the plaintiffs and class members particularly susceptible to economic coercion by which they would be compelled to accept an "ill-advised settlement" of their legitimate Claims, at an amount less than the true value of the Claims, to secure benefits which should have been paid to them automatically and without them having to provide a release or complete settlement.

44.    By letter to the State of Montana dated July 18, 2005, National Indemnity Company denied responsibility for the Claims, purporting to reserve all rights under Insurance Policy No. PE250001.

45.    Thereafter, National Indemnity Company did not attempt to fulfill any of the duties it owed to the plaintiffs or class members. Upon information and belief,[2] National Indemnity Company will contend that various provisions of Insurance Policy No. PE250001 negated coverage, excusing it from compliance with its duties owing to the plaintiffs and class members.

46.    In fact, as alleged elsewhere herein, National Indemnity Company had an incentive and plan to delay resolution of any policy defenses to delay the date upon which it ultimately would be required to pay any amounts to plaintiff's or the

---

[2] Counsel who files this pleading intends that allegations herein made upon "information and belief" are made pursuant to Rule 11(b)(3), Fed.R.Civ.P., in that counsel believes that they will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

class members.

47.     Pursuant to that plan, National Indemnity Company contested coverage for the Libby Asbestos claims for nearly a decade before filing an action seeking declaratory judgment as to the validity of its coverage defenses. That matter (the Coverage Action) took nearly another decade. It was foreseeable that resolution of the Coverage Action would take that long.

48.     Because of National Indemnity Company's failures to do the necessary investigation, coverage acknowledgement, settlement offer or negotiation, or make advance payments, and because National Indemnity Company delayed resolution of its policy defenses for nearly two decades, each plaintiff's and each class member's sole route to achieve a timely resolution of a Claim was to negotiate solely and directly with National Indemnity Company's insured, the State of Montana, even as National Indemnity Company denied coverage for each Claim. As a result, each plaintiff and class member was subject to unfair exploitation of their position of disadvantage including their economic and health care related difficulties arising from the injuries described in each Claim.

49.     National Indemnity Corporation used its improper denial of coverage and unreasonable delay to leverage the plaintiffs and class members into settling, forcing them to settle with the State of Montana to obtain benefits that should have been freely paid to them. National Indemnity Company used its denial of coverage,

prolonged by its delay in bringing the Coverage Action, as a Sword of Damocles hung over the head of both its insured (the State of Montana) and the third-party claimants to whom it owed duties, i.e., the plaintiffs and class members.

50. This conduct forced the plaintiffs and class members to litigate and settle their Claims "in coverage darkness."

51. Plaintiffs' and class members' Claims were settled in one of two settlements, one (round 2) finalized by Court approval on January 18, 2017, and one (round 3) finalized by Court approval on January 7, 2019.

52. National Indemnity Company knew and understood the exploitative effect that its delay would and did inflict  upon each plaintiff and class member.

53. National Indemnity Company acted and failed to act:

(a) With an intent to take advantage of each plaintiff's and each class member's disadvantaged position during the litigation of the Claims and the settlement negotiations between them and the State of Montana;

(b)  With intent and knowledge of the deterring and limiting effect on the State of Montana's ability to pay full settlement value to each given that the State faced a continuing lengthy and expensive litigation battle with National Indemnity Company to recover indemnification; and

(c)    With intent that the exploitation effect would decrease National

Indemnity Company's indemnification exposure.

54.    National Indemnity Company acted with actual malice as that term is

used on M.C.A. § 27-1-220, in that it acted had knowledge of facts or intentionally

disregarded facts that created a high probability of injury to the plaintiffs and class

members but deliberately proceeded to act in conscious or intentional disregard of,

or with indifference to, the high probability of injury to the plaintiffs and class

members.

55.    At no time did National Indemnity Company attempt in any way to

lessen the impact on the plaintiffs and class members from the exploitative effect,

such as by offering to contribute to a settlement with agreed payments contingent

upon a finding of policy indemnity coverage, or otherwise through good faith

meaningful participation in the settlement negotiations over the Claims.

56.    In light of National Indemnity Company's failure and refusal to make

any offers or otherwise participate in reaching a settlement of plaintiffs' and class

members' Claims, and as part of an arms-length and mediated settlement, the State

of Montana agreed that as part of the consideration for the release of their Claims

each would get additional settlement money if and when additional payment was

made by National Indemnity Company to the State of Montana (herein

"Contingent Payment"). This Contingent Payment amount was part of a Court-

approved settlement, and was a good faith effort by Plaintiffs, class members and the State of Montana to mitigate the effect of National Indemnity Company's failure to attempt in good faith to reach a prompt, fair, and equitable settlement. During the court's settlement approval process, National Indemnity Company contemporaneously knew of this provision in the settlement and made no objection thereto. National Indemnity Company did not object because it intended to take the position that the amount of the Contingent Payment would limit its indemnification amount, even as it maintained the intent to challenge the reasonableness of the Contingent Payment and the settlement amount.

57.     National Indemnity Company knew that plaintiffs and class members were relying on timely receipt of the payment of such Contingent Payment. A district court of the State of Montana (the "District Court") entered orders: (a) finding National Indemnity Company liable for millions of dollars in defense costs incurred by the State of Montana and indemnification of the State of Montana with respect to undefended Claims; (b) finding that the plaintiffs' and class members' exposures were among the occurrences covered by Insurance Policy No. PE250001; and (c) ruling that National Indemnity Company "is responsible" for the full amounts of the settlements, including the contingent amounts approved as part of those settlements. In spite of those orders and rulings, National Indemnity Company made no prompt or timely attempts to pay the indemnity amounts owed

to the State of Montana, or to offer or otherwise take any action to permit the plaintiffs and class members to receive the Contingent Payment or the income benefit of the Contingent Payment. Instead, National Indemnity Company calculated to continue to take advantage of the Float—using "other people's money," the plaintiffs' and class members' money—to generate Investment Profit for Berkshire Hathaway. It did so at the expense of the plaintiffs, class members and similarly situated Montana claimants.

58.    After District Court approval of the settlement of plaintiffs' and class members' Claims, National Indemnity Company attacked those settlements with the State of Montana, including the Contingent Payment as "unreasonable on [its] face," and not based on a "fair value of the Libby Claims being settled." National Indemnity Company further denied responsibility for the Contingent Payment amounts upon the contention that it is not obligated to pay in absence of its written agreement to the settlement terms, notwithstanding its failure and refusal to participate in good faith in settlement negotiations, and notwithstanding its failure to object to the settlements when presented to the District Court for approval. By refusing to honor its indemnification duty for the Contingent Payment, National Indemnity Company compounded its wrongful conduct, including its violation of its common-law and statutory duties owing the plaintiffs and class members.

59.    In patent bad faith, National Indemnity Company affirmatively

attempted to and did:

    (a)    Force an unfairly discounted settlement through exploitation of:

        i.    The plaintiffs' and class members' position of disadvantage and ongoing serious harm;

        ii.    The expense and delay it forced upon the State of Montana in seeking and obtaining indemnity; and

        iii.    The "coverage darkness" it imposed upon the plaintiffs and class members by reason of its unreasonable delay in bringing the Coverage Action;

    (b)    Contend that such artificially-depressed and unfair settlement amount was the upper limit of National Indemnity Company's indemnification liability; and

    (c)    Challenge all of the settlement amount, the fact of the Contingent Payment, and the amount of the Contingent Payment.

National Indemnity Company did not offer to reimburse the State for the amount of the Contingent Payment, or to pay it directly to the plaintiffs, until after the Montana Supreme Court had ruled.

    60.    National Indemnity Company took no action to investigate, quantify, or offer or make any advance payment of medical expenses or wage losses under the Claims. National Indemnity Company deliberately disregarded its advance

payment duties with a strategic intent to both delay (to take continued advantage of the Float to earn Investment Profit) and to apply further and continued economic and emotional leverage to the plaintiffs and class members (to coerce a lower ultimate settlement).

61.    Because National Indemnity Company's strategy was based on investment motivation which generated investment capital and profit regardless of a ultimate accountability for the insured claims and good faith duties, National Indemnity Company took no action to investigate, quantify, or offer or make any advance payment or even conditional offer of medical expenses or wage losses:

   (a)    Even though it knew the State's liability on the Claims was reasonably clear;

   (b)    Even after the District Court had ruled against it on its coverage defenses; and,

   (c)    Even after the Montana Supreme Court had affirmed the rulings of the District Court regarding coverage and the invalidity of National Indemnity Company's policy defenses.

**Class Action Allegations**

62.    The plaintiffs bring this action as a class action on their own behalf and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class of individuals similarly situated.

63.    **Class Definition:** The Class is defined as all individuals who worked at W.R. Grace's Libby operations or who were household members of such workers and:

(a)    Who presented Claims against the State of Montana for asbestos related disease;

(b)    Whose Claims were settled in one of two group settlements:

i.    Round 2, finalized by Court approval on January 18, 2017; and

ii.    Round 3, finalized by Court approval on January 7, 2019; and

(c)    Whose Claim was based on asbestos exposures including injurious exposures between July 1, 1973, and June 30, 1975, inclusive.

64.    **Sub-class Definitions:**

(a)    **Sub-class A:** Sub-class A is defined as those members of the class (as defined above) who settled in round 2; and

(b)    **Sub-class B:** Sub-class B is defined as those members of the class (as defined above) who settled in round 3.

65.    **Class Claims:** Plaintiffs allege each of the claims stated below as Class Claims on behalf of either Sub-class A, Sub-class B, or both, as indicated.

66.    **Requirements of Federal Rule of Civil Procedure 23(a):**

(a)    **Numerosity:** The class is estimated to exceed 200 individuals

who are geographically dispersed over numerous counties in the State of Montana and outside the State of Montana. The size of the class and geographical location of the class members render individual joinder of all members impracticable.

(b)  **Commonality:** The Class Claims arise from National Indemnity Company's identical treatment of the plaintiffs and the proposed class members as described above. There are questions of law and fact common to each member of the class, including, but not limited to:

i.  Whether National Indemnity Company owed statutory and/or common law duties with respect to class members' Claims and, if so, what those duties were;

ii.  Whether National Indemnity Company breached such duties;

iii.  The nature (if not the amount) of damages suffered by the class members;

iv.  The class members' entitlement to certain relief, including (but not limited to) disgorgement; and

v.  Whether National Indemnity Company acted with malice such that punitive damages should be assessed.

(c)  **Typicality:** The plaintiffs were members of the settlement groups

and are representative of the proposed class members. They were subject to the same bad faith conduct by National Indemnity Company and suffered from the same exploitative effect as the proposed class members. All of the plaintiffs' claims are based upon the same factual and legal theories. Additionally, all class members will benefit by the action brought by plaintiffs by obtaining relief in the manner described below.

(d) **Adequacy of Representation:** All of the plaintiffs are members of the Class defined above. Some of them are members of Sub-class A and others are members of Sub-class B. The plaintiffs have the same interest as the class members in seeking compensation for National Indemnity Company's conduct. The plaintiffs have no interests that conflict with the interests of the class or class members. The plaintiffs have also retained competent and experienced legal counsel in insurance bad faith litigation and class actions. Plaintiffs will fairly and adequately protect the interests of the class.

67. **Requirements of Federal Rule of Civil Procedure 23(b):**

(a) **FRCP 23(b)(2), Same Treatment:** National Indemnity Company treated all of the Class members the same. National Indemnity

Company has acted on grounds generally applicable to the class,

thereby making final declaratory relief appropriate with respect to

the class should any of the practices be determined to be illegal or

unfair.

(b) **<u>FRCP 23(b)(3), Predominance & superiority</u>:** Common

questions of law and fact predominate in this action over questions

affecting only individuals. The answers to the questions of law

will be identical for all members of the class. A class action is a

superior method to fairly and efficiently adjudicate all or most of

the issues in this case. The other available methods of adjudication

are individual joinder, which is impracticable, and/or hundreds of

individual lawsuits raising the identical factual and legal issues

and creating the danger of inconsistent adjudications on the

central common issues in numerous state and federal courts in

Montana. This multiplicity of litigation over common issues

would be inefficient and wasteful of limited judicial resources.

Further, the class members are injured individuals who may be

unable to locate or afford attorneys and have little interest in

individually controlling the prosecution of their claims in separate,

individual actions. Most class members are probably unaware that

their rights under Montana law have been violated. There is no

litigation already begun concerning the controversy involving

National Indemnity Company's bad faith and other wrongful

conduct vis-à-vis the class members. Concentrating the litigation

of the claims in this forum is desirable because the forum is

convenient and easily accessible for the parties and likely

witnesses. There are no likely difficulties in managing a class

action.

68.    **FRCP 23(c)(4), Class adjudication of particular issues:** Particular

class issues (including, but not limited to those stated above) are also appropriately

resolved on a class basis pursuant to Rule 23(c)(4), F.R.Civ.P.

### Claims for Relief

### First Cause of Action
### (Independent Cause of Action under M.C.A. § 33-18-242(1) on behalf of the members of Sub-class B)

69.    Plaintiffs incorporate the foregoing allegations as if set forth in full

herein.

70.    Plaintiffs assert this cause of action on behalf of themselves and on

behalf of the members of Sub-class B, i.e., those members of the class who settled

their Claims in Round 3.

71.    National Indemnity Company owed plaintiffs and each member of

Sub-class B the duties stated in section 33-18-201, subsections (1), (4), (5), (6) and (13), of the Montana Code Annotated.

72.    National Indemnity Company's duty under subsections (6) and (13) to act in a certain manner regarding claims on which liability is reasonably clear subsumes a duty to take such actions which are reasonably within its control to achieve clarity and/or to dispel any lack of clarity as to liability. National Indemnity Company's duty to conduct an adequate investigation further suggests such a duty to seek to promptly and in good faith resolve any issues that might be thought to render liability unclear. If it were otherwise, an insurer could render itself exempt from its duties under subsections (6) and (13) simply by failing to investigate to discover the answers to factual and/or legal issues, and relying upon the ensuing lack of clarity to avoid responsibility.

73.    For instance, and without limitation, and without waiving any argument regarding National Indemnity Company's duties regardless of asserted policy defenses, National Indemnity Company had a duty to act reasonably and promptly to resolve the policy defenses that it asserted and which it claims rendered liability on the Claims unclear. National Indemnity Company breached that duty by its failure to timely initiate the Coverage Action. Instead, National Indemnity Company sought to and did capitalize upon the existence of the supposed coverage dispute as a reason to not attempt to fulfill its obligations to the

plaintiffs and class members so that it could continue to reap Investment Profit by using the Float.

74.    National Indemnity Company violated § 201(1) (duty to not misrepresent pertinent facts or policy provisions) by advancing, in bad faith, pretextual coverage defenses which, regardless of the lack of merit or absurdity, served as a cover story and bad faith excuse for the ulterior motive and actual reason for its conduct: Float Profit on time-value from delayed claim resolution.

75.    National Indemnity Company violated § 33-18-201(4) (duty to adequately investigate) by its utter failure to investigate the Claims, as alleged above. It is impossible to negotiate in good faith without sufficiently investigating the injuries sustained by the plaintiffs and class members and resulting medical expenses and other losses. National Indemnity Company ignored its investigation duties with the intent that it would not participate in settlement, would not make any advance payment of any medical expenses or wage loss, would not take any action to lessen the exploitative effects described above, with the strategy of taking advantage of the exploitative leverage effects to reduce its indemnity exposure, and with the intent and strategy that everything that delayed resolution of the claims would increase the Float Profit on time-value of the delayed claim payment.

76.    National Indemnity Company violated § 33-18-201(5) (duty to affirm or deny coverage within a reasonable time) by its conduct described above,

including:

> (a)  Denying coverage in bad faith, and maintaining that denial in bad
> faith, including the absurd contentions such as that a bodily injury
> that "occurs" during the policy period is not an "occurrence" and
> the position that an injurious exposure to asbestos is not an
> "exposure." Such bad faith bases for coverage denial were
> deliberately advanced by National Indemnity Company with a bad
> faith intent to create: (a) the delay essential to the strategy to use
> the Float to maximize Investment Profit; (b) uncertainty; and (c)
> millions of dollars in litigation expense for the State of Montana
> and the plaintiffs and class members. National Indemnity
> Company intended that each of those effects would contribute to
> the disadvantage of its insured, the plaintiffs, and the class
> members, would result in lower settlement amounts that National
> Indemnity Company would ultimately have to indemnify, and
> would delay payment on the Claims so that National Indemnity
> Company would continue to experience and enjoy Investment
> Profit on the Float—amounts that belonged to the plaintiffs and
> class members and which should have been paid to the plaintiffs
> and class members; and

(b)    Intentionally and unreasonably delaying resolution of the policy

defenses it raised by, among other things, choosing not to file the

Coverage Action until almost a decade had passed after it had

become aware that Libby Asbestos Claims had been asserted

against its insured, thus ensuring that claimants, including

plaintiffs and the class members, would not promptly and timely

achieve a definitive resolution until after National Indemnity

Company had generated the time-value investment income which

was dependent on creation of delay through postponed litigation,

and bad faith and pretextual excuses for delay.

77.    National Indemnity Company violated § 33-18-201(6) (duty to

attempt to effectuate a prompt, fair, and equitable settlement of a clear liability

claim) by its above-described conduct. National Indemnity Company acted with a

bad faith intent, including to create delay, exploitation, leverage and disadvantage

that would result in lowering the settlement amount National Indemnity Company

would ultimately have to indemnify and maximizing the Investment Profit it would

enjoy by minimizing and delaying payment on the Claims. National Indemnity

Company's breaches of subsection (6) include, but are not limited to, its:

(a)    Failing and refusing to engage in any good faith settlement

discussions with plaintiffs or the class members;

(b)     Declining and avoiding settlement for the bad faith reason of causing delay essential to its Investment Profit strategy.

(c)     Failing and refusing to advance pay medical expenses and lost wages pursuant to *Ridley v. Guaranty Nat'l Ins. Co.*;

(d)     Raising meritless coverage defenses to muddle the fact that the Claims were Clear Liability Claims;

(e)     Its delay in filing the Coverage Action to avoid a resolution of its policy defenses, as an attempt perpetuate the appearance of coverage questions that might serve as a pretextual justification for its noncompliance with subsection (6).

78.     National Indemnity Company violated § 33-18-201(13) (duty to settle when liability is clear under one portion of the policy instead of trying to influence a settlement under another portion) by its above-described conduct. National Indemnity Company's breaches of subsection (13) include, but are not limited to, its:

(a)     Failing and refusing to advance pay medical expenses and lost wages pursuant to *Ridley v. Guaranty Nat'l Ins. Co.*, with a bad faith intent to influence the settlement of the remainder of each Claim by reason of the economic and emotional distress and difficulties of an injured plaintiffs and class members. National

Indemnity Company strategized to thereby lower the amount it would ultimately have to indemnify and delay the payment of such medical expenses while it enjoyed its Investment Profit on such unpaid amounts;

(b)    Raising meritless coverage defenses to muddle the fact that the Claims were Clear Liability Claims;

(c)    Its delay in filing the Coverage Action to avoid a resolution of its policy defenses, as an attempt perpetuate the appearance of coverage questions that might justify its noncompliance with subsection (6).

(d)    Failing and refusing to make indemnification payments on the undefended Claims in order to influence the settlement of the defended Claims.

79.    National Indemnity Company did not have a reasonable basis in law or fact for denying the Claims of the plaintiffs and class members, or the amount of such Claims because it acted irrespective of the facts or Montana law. Instead, National Indemnity Company's violation of these statutory duties was carried out pursuant to a nationally applicable plan and scheme pursuant to which National Indemnity Company and its affiliate or parent company, Berkshire Hathaway, Inc., profited from delay in the payment of claims, including Clear Liability Claims,

despite the duties that National Indemnity Company owed under Montana law.

80.    National Indemnity Company's breach of the above-described statutory duties in Section 33-18-201, MCA, caused the damages to the plaintiffs and class members described below in this Amended Complaint, in the section below the heading titled "Damages."

81.    The plaintiffs and class members are entitled to recover from National Indemnity Company such damages as were proximately caused by the violation of those statutory subsections.

82.    National Indemnity Company's breach of the above-described statutory duties in Section 33-18-201, MCA, was done with actual malice such that punitive damages should be assessed against National Indemnity Company in an amount sufficient to punish, deter, and make an example of its conduct, as determined by the jury.

### Second Cause of Action
### (Common-law claim for breach of statutory duties on behalf all plaintiffs and all class members)

83.    Plaintiffs incorporate the foregoing allegations as if set forth in full herein.

84.    Plaintiffs assert this cause of action on behalf of all members of the class.

85.    Plaintiffs assert this claim pursuant to *Klaudt v. Flink,* 202 Mont. 247,

658 P.2d 1065 (1983) and *O'Fallon v. Farmers Ins. Exch.*, 260 Mont. 233, 242–45, 859 P.2d 1008, 1014–15 (1993).

86.    National Indemnity Company did not acknowledge and act reasonably promptly upon communications with respect to claims arising under Insurance Policy No. PE250001. National Indemnity Company did so with such frequency as to indicate a general business practice.

87.    Upon information and belief, National Indemnity Company failed to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies, including Insurance Policy No. PE250001 and including the Claims presented by the plaintiffs and class members. National Indemnity Company did so with such frequency as to indicate a general business practice.

88.    National Indemnity Company violated §§ 33-18-201(2) (failure to acknowledge and act reasonably promptly upon communications with respect to claims) and (3) (failure to adopt and implement reasonable standards for the prompt investigation of claims) by the above-described conduct including, but not limited to, its delay in filing the Coverage Action.

89.    National Indemnity Company's breach of these duties caused the damages to plaintiffs and class members described in the section of this Amended Complaint below titled "Damages."

90.     Plaintiffs and class members are entitled to recover their damages from National Indemnity Company.

91.     National Indemnity Company's breach of the above-described statutory duties in Section 33-18-201, MCA, was done with actual malice such that punitive damages should be assessed against National Indemnity Company in an amount sufficient to punish, deter, and make an example of its conduct, as determined by the jury.

**Third Cause of Action**
**(Common-law bad faith**
**on behalf all plaintiffs and all class members)**

92.     Plaintiffs incorporate the foregoing allegations as if set forth in full herein.

93.     Under the common law of Montana, National Indemnity Company owed and owes a duty of good faith to third-party insurance claimants, including the plaintiffs and class members. This duty required National Indemnity Company to handle the plaintiffs' and class members' claims in good faith including through fair dealing, reasonableness and honesty, and through conformance with the commercial standards which sustain the protection purpose of liability insurance. Specifically, it required National Indemnity Company to refrain from:

(a)     Using claims and claim reserves for fully accrued Clear Liability Claims as a source of marketable investment capital for

speculative risk financial investment after the insured contingency has occurred, and in a manner that undermines the protection purpose of insurance for the pure risk of the insured loss.

(b)     Advancing, in bad faith and dishonestly, pretextual coverage defenses lacking in reasonable merit.

(c)     Refusing to perform or participate in claim investigation, claim evaluation, claim settlement negotiation, or advance payment resolution all with the bad faith motive to extend the period of Float under its investment strategy.

(d)     Taking advantage of its position of superior bargaining power;

(e)     Exploiting the disadvantaged position of the plaintiffs and class members, and/or the unfair advantage arising from a third-party insurance claimant's claim-related financial devastation, economic distress, physical injuries and vulnerabilities, and other difficulties;

(f)     Gaining or increasing such position of power and exploitation through the withholding of clear liability amounts, failure to attempt settlement, and/or delay in settlement offers or payments;

(g)     Attempting to muddle the clarity of its liability to the plaintiffs and class members by raising meritless alleged defenses to

coverage under the Insurance Policy No. PE250001;

(h)   Failing to seek to promptly resolve coverage defenses, regardless of their merit, but instead prolonging uncertainty, and forcing the plaintiffs and class members to litigate and settle "in coverage darkness."

94.   By its conduct, including that conduct described in all preceding allegations in this Amended Complaint, National Indemnity Company breached the common law duties that it owed to the plaintiffs and class members.

95.   National Indemnity Company's breach of its common law duties caused the damages to Plaintiffs and class members described in the section of this Amended Complaint below titled "Damages."

96.   Plaintiffs and class members are entitled to recover their damages from National Indemnity Company.

97.   National Indemnity Company's breach of the above-described statutory duties in Section 33-18-201, MCA, was done with actual malice such that punitive damages should be assessed against National Indemnity Company in an amount sufficient to punish, deter, and make an example of its conduct, as determined by the jury.

## Fourth Cause of Action
### (Violation of *Ridley* duties
### on behalf all plaintiffs and all class members)

98.     Plaintiffs incorporate the foregoing allegations as if set forth in full herein.

99.     Liability for the claim of each plaintiff and class member has at all relevant times been reasonably clear. National Indemnity Company has admitted and affirmatively urged the position in its court filings that the liability of the State is demonstrated by "undisputed" facts and that, as far back as 1973—well before the plaintiffs and class members presented their claims—"the State knew about the toxic asbestos conditions at the Libby Mine and knew that workers were subject to risk and injury and death as a result of their exposure to those conditions."

100.    Under both the common law and statutory law of the State of Montana, National Indemnity Company owes particular duties to third-party insurance claimants to whom liability is reasonably clear. Among those particular duties, National Indemnity Company was bound to:

(a)     Make advance payment of medical expense and wage loss amounts sustained in an insured event;

(b)     Not take advantage of its position of superior bargaining power; and

(c)     Not exploit the disadvantaged position of the plaintiffs and class

members, and/or the unfair advantage arising from a third-party

insurance claimant's claim-related financial devastation, economic

distress, physical injuries and vulnerabilities, and other

difficulties; and

(d)     Gain or increase such position of power and exploitation through

the withholding of clear liability amounts, failure to attempt

settlement, and/or delay in settlement offers or payments.

101.   National Indemnity Company's duties to act in a certain manner

regarding claims on which liability is reasonably clear subsumes a duty to take

such actions which are reasonably within its control to achieve clarity and/or to

dispel any lack of clarity as to liability. National Indemnity Company's duty to

conduct an adequate investigation further suggests such a duty to seek to promptly

and in good faith resolve any issues that might be thought to render liability

unclear. If it were otherwise, an insurer could render itself exempt from its duties

regarding clear liability claims simply by failing to investigate to discover the

answers to factual and/or legal issues, and relying upon the ensuing lack of clarity

to avoid responsibility.

102.   For instance, and without limitation, and without waiving any

argument regarding National Indemnity Company's duties regardless of asserted

policy defenses, National Indemnity Company had a duty to act reasonably and

promptly to resolve the policy defenses that it asserted and which it claims rendered liability on the Claims unclear. National Indemnity Company breached that duty by its failure to timely initiate the Coverage Action. Instead, National Indemnity Company sought to and did capitalize upon the existence of the supposedly coverage dispute as a reason to not attempt to fulfill its obligations to the plaintiffs and class members so that it could continue to reap Investment Profit by using the Float.

103.   National Indemnity Company's breach of its duty to make advance payments caused the damages to plaintiffs and class members described in the section of this Amended Complaint below titled "Damages."

104.   Plaintiffs and class members are entitled to recover their damages from National Indemnity Company.

105.   National Indemnity Company's breach of its duty to make advance payment was done with actual malice such that punitive damages should be assessed against National Indemnity Company in an amount sufficient to punish, deter, and make an example of its conduct, as determined by the jury.

## Damages

106.   The wrongdoing of National Indemnity Company described in the above allegations caused the following injuries, damages and losses to plaintiffs and class members:

(a)     Damages resulting from having to settle for less than fair value by reason of having their vulnerable position exploited and being pressured  and deprived of  an opportunity to secure a timely fair settlement, which damages are in an amount equal to the difference between the Claims' actual settlement amount and a fair settlement amount, together with interest, and the related economic insecurity and distress, impairment of ability to pay for medical expenses, interference with end-of-life decisions and emotional distress resulting from the unfairly pressured settlement;

(b)     Damages resulting from failure to timely and promptly pay the Contingent Payment portion of settlement, together with interest, and the related economic insecurity and distress, impairment of ability to pay for medical expenses, interference with end-of-life decisions and emotional distress resulting from the withheld Contingent Payment and the unfairly pressured settlement;

(c)     Damages resulting from delay and failures to acknowledge coverage, investigate and attempt settlement, including the time-value of money, economic insecurity and distress, impairment of ability to pay for medical expenses, interference with end-of-life

decisions and emotional distress;

(d)    Damages resulting from failure to make advance payments of
medical and wage loss injuries, including the time-value of
money, economic insecurity and distress, impairment of ability to
pay for medical expenses, interference with end-of-life decisions
and emotional distress; and

(e)    Damages resulting from the failure to attempt to promptly resolve
any coverage disputes including delays in communications and
delays in filing the Coverage Action, including the time-value of
money, economic insecurity and distress, impairment of ability to
pay for medical expenses, interference with end-of-life decisions
and emotional distress.

**Fifth Cause of Action
(Disgorgement Relief
on behalf all plaintiffs and all class members)**

107.   Plaintiffs incorporate the foregoing allegations as if set forth in full
herein.

108.   National Indemnity Company issued Insurance Policy No. PE250001
to the State of Montana, agreeing to pay damages for bodily injury which the State
of Montana became legally obligated to pay.

109.   The plaintiffs and the class members presented claims against the

State of Montana for damages for bodily injury.

110.    The plaintiffs and the class members were intended third-party beneficiaries of the insurance contract between National Indemnity Company and the State of Montana. Specifically, they were intended third-party beneficiaries of the promise contained therein to pay damages for bodily injury for which the State of Montana was liable.

111.    National Indemnity Company owed various statutory and common law duties to the plaintiffs and class members concerning their Claims. National Indemnity Company breached those duties as alleged above.

112.    National Indemnity Company's breach of duties owing to the plaintiffs and class members was intentional, in violation of clear legal duties, and made with a strategic purpose and effect to continue to enjoy the Float on the Long-Tail Liabilities represented by plaintiffs' and class members' Claims so that it could continue to generate Investment Profit on monies that should have been paid to the plaintiffs and class members.

113.    National Indemnity Company's intentional and strategic breach of duties (hereafter, its "Opportunistic Breach") was facilitated by its strategy of both manufacturing disputes as to coverage and delaying resolution of such coverage disputes by, among other things, delay in initiating the appropriate declaratory judgment or other action to obtain a definitive answer to the coverage objections it

raised.

114.    National Indemnity Company deliberately breached its duties to the plaintiffs and the class members even while recognizing that its failures to:

      (a)     Timely advance medical expenses, lost wages, and other clearly ascertainable damages; and

      (b)     Attempt in good faith to effectuate a prompt, fair, and equitable settlement with the plaintiffs and the class members;

would apply economic pressure, creating coerced economic distress and emotional distress, leveraging the plaintiffs and the class members into settling for a lesser amount than they would have demanded but for such economic and emotional duress and coercion.

115.    National Indemnity Company further recognized that its:

      (a)     Denial of coverage and raising non-meritorious coverage defenses; and

      (b)     Failure to seek to timely initiate the Coverage Action or to otherwise obtain a definitive and binding resolution of its coverage objections;

would apply yet further economic and emotional pressure by forcing the plaintiffs and the class members to either delay settlement of the Claims or to litigate and settle "in coverage darkness."

116.   National Indemnity Company's strategy and conduct was calculated to, and did, artificially and unfairly depress the amount for which the plaintiffs and the class members settled their Claims and delayed resolution of those Claims.

117.   By that strategy, National Indemnity Company was able to, and did, retain more of the Float, and for a longer period of time, enabling it to maximize its Investment Profit.

118.   Upon information and belief, the Investment Profit that National Indemnity Company was able to realize by unfairly minimizing and delaying settlement of the plaintiffs' and the class members' Claims exceeds the amount of compensatory damages that the plaintiffs and the class members suffered.

119.   National Indemnity Company has been unjustly enriched in the amount of the Investment Profit that National Indemnity Company realized on the monies that should have been paid to the plaintiffs and the class members between the date that it should have been paid and the date that it was paid or will be paid. That amount is referred to hereafter as National Indemnity Company's Illicit Profit.

120.   National Indemnity Company is a conscious wrongdoer which was unjustly enriched in the amount of its Illicit Profit through its own misconduct including by:

(a)     Taking advantage of economic and emotional duress that the

plaintiffs and the class members experienced as a result of their

injuries and by exacerbating that duress by its tactics, including

denial of coverage and nonpayment in advance of medical

expenses and other clearly ascertainable damages;

(b)  Its Opportunistic Breach of both its contract with the State of

Montana, i.e., Insurance Policy No. PE250001, and its duties

owing directly to the plaintiffs and the class members;

(c)  Its breach of duties owing by virtue of its relationship to third-

party claimants like the plaintiffs and the class members by which

it, for instance, was obligated to act in good faith, to act promptly,

to attempt to achieve a fair and equitable settlement, to refrain

from leveraging and taking advantage of the vulnerability of the

plaintiffs and the class members; and

(d)  Its interference with the legally protected interests of the plaintiffs

and the class members, including their interests in having their

Claims investigated, adjusted, and settled in accordance with the

standards and duties imposed by Montana law.

121.  The Illicit Profit that National Indemnity Company realized on monies

owed to the plaintiffs and the class members is an inequitable unjust enrichment

because it was generated: by taking advantage of the duress of the plaintiffs and

the class members; through Opportunistic Breach; by National Indemnity Company's breach of its duties arising from its relationship with the plaintiffs and the class members; and its interference with the legally protected interests of the plaintiffs and the class members.

122.   National Indemnity Company engaged in the wrongful conduct alleged in this Amended Complaint pursuant to a plan and strategy, applied nationwide, independent of the requirements of Montana law.

123.   Among other things, National Indemnity Company's nationwide plan is calculated to and did secure a benefit for National Indemnity Company in the form of capital that it and its parent company, Berkshire Hathaway, Inc., could use as Float to generate Investment Profit. This strategy was calculated to and does take advantage of the fact that, unlike other sources of capital, the insurance Float, money which Buffet acknowledged belonged to other people, was nonetheless not subject to a demand for repayment or a strike price beyond the control of National Indemnity Company. Instead, through delay and other tactics, National Indemnity Company was able to control and postpone any repayment obligation.

(a)    First, the obligation of its insured (in this case, the State of Montana) to any particular claimant would not be fixed unless and until that claimant obtained a judgment against or settled with the insured; and

(b)    Second, National Indemnity Company's obligation to then

indemnify its insured, or to make advance payments directly to

any third-party claimant (in this case, the plaintiffs and the class

members) would not be fixed unless and until any coverage

dispute were resolved, a process which National Indemnity

Company can control and prolong by various means, including by

raising dubious or specious policy defenses and by failing to seek

to promptly obtain a definitive and binding resolution of its policy

defenses.

124.    National Indemnity Company's wrongful conduct was part of a

broader plan and scheme which predates the date upon which the plaintiffs and the

class members first presented their Claims. For instance, and without limitation,

National Indemnity Company's assertion of specious policy defenses and its delay

in seeking judicial resolution by its delay in initiating the Coverage Action

predated the plaintiffs' and the class members' presentation of their Claims, but

nonetheless directly affected the plaintiffs and the class members.

125.    National Indemnity Company's wrongful conduct that predated the

presentation of the plaintiffs' and class members' Claims was intended to, and did,

delay the presentation of their Claims. If National Indemnity Company had dealt

promptly, fairly, and in good faith, and otherwise in accordance with its duties to

earlier claimant's, the plaintiff's' and class members' Claims would have been presented for payment prior to the date upon which they were presented.

126.  Even though National Indemnity Company has now paid some amounts to be State of Montana, and even if National Indemnity Company were to pay to the plaintiffs and class members the additional amounts which they seek herein as compensatory damages, National Indemnity Company still comes out ahead by a its misconduct allowing it to retain the Float which it used to generate Investment Profit.

127.  Justice must intervene in the circumstances of deliberate intentional wrongdoing and Opportunistic Breach because compensatory damages are not the appropriate measure of National Indemnity Company's illicit profits and because the object of the controlling principles is to eliminate the profit from wrongful conduct.

128.  The Court should order disgorgement to the plaintiffs and the class members of National Indemnity Company's Illicit Profit.

## PRAYER FOR RELIEF

129.  Plaintiffs pray for the following relief:

(a)    Certification of a class and sub-classes as stated above;

(b)    An award of compensatory damages in favor of the class in an amount to be proved at trial, as determined by the jury, including

compensation for;

i.    Damages resulting from having to settle for less than fair value by reason of having their vulnerable position exploited and being pressured  and deprived of  an opportunity to secure a timely fair settlement, which damages are in an amount equal to the difference between the Claims' actual settlement amount and a fair settlement amount, together with interest, and the related economic insecurity and distress, impairment of ability to pay for medical expenses, interference with end-of-life decisions and emotional distress resulting from the unfairly pressured settlement;

ii.    Damages resulting from failure to timely and promptly pay the Contingent Payment portion of settlement, together with interest, and the related economic insecurity and distress, impairment of ability to pay for medical expenses, interference with end-of-life decisions and emotional distress resulting from the withheld Contingent Payment and the unfairly pressured settlement;

iii.    Damages resulting from delay and failures to acknowledge coverage, investigate and attempt settlement, including the

time-value of money, economic insecurity and distress, impairment of ability to pay for medical expenses, interference with end-of-life decisions and emotional distress;

iv.   Damages resulting from failure to make advance payments of medical and wage loss injuries, including the time-value of money, economic insecurity and distress, impairment of ability to pay for medical expenses, interference with end-of-life decisions and emotional distress;

v.   Damages resulting from the failure to attempt to promptly resolve any coverage disputes including delays in communications and delays in filing the Coverage Action, including the time-value of money, economic insecurity and distress, impairment of ability to pay for medical expenses, interference with end-of-life decisions and emotional distress; and

vi.   Any other damages to which plaintiffs or the class members may be entitled according to the proof at trial.

(c)   An award of punitive damages in an amount to be determined by the jury;

(d)   An order imposing a remedy addressing National Indemnity

Company's unjust enrichment and Illicit Profit, including

disgorgement of those Illicit Profits to the class members; and

(e)    Such other and further relief, equitable or legal, which is just

and/or to which plaintiffs or class members are entitled.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues herein.


**BALDWIN LAW, PLLC**

By:   /s/ Robert K. Baldwin


**McGARVEY, HEBERLING, SULLIVAN
& LACEY, P.C.**

By:   /s/ Allan M. McGarvey

Attorneys for Plaintiffs